# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 06-2115

_____

| | |
|---|---|
| Thomas M. Horras, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | * |
| | * |
| Michael O. Leavitt, Secretary, | * |
| United States Department of Health | * |
| and Human Services, | * |
| | * |
| Respondent. | * |

_____

No. 06-2124

_____

Appeals from United States
Department of Health and Human
Services Departmental Appeals
Board.

| | |
|---|---|
| Christine Richards, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | * |
| | * |
| United States Department of Health | * |
| and Human Services, | * |
| | * |
| Respondent. | * |

_____

Submitted: June 14, 2007
Filed: August 7, 2007

_____

Before BYE, RILEY, and BENTON, Circuit Judges.
_____

BENTON, Circuit Judge.

Thomas M. Horras is the founder, and former owner, president, and chief operating officer of Hawkeye Health Services, Inc. Christine Richards is Hawkeye's former Director of Finance. As a "home health agency," Hawkeye participated in Medicare and Medicaid. Horras and Richards appeal civil monetary penalties (CMPs), assessments, and exclusions from all federal health care programs, imposed by the Department of Health and Human Services (DHHS) for making "false or fraudulent" claims on Hawkeye's cost reports. Having jurisdiction under 42 U.S.C. § 1320a-7a(e), this court affirms.

I.

Horras founded Hawkeye in 1986 as a home health agency offering "home health services" to Iowans. *See* **42 U.S.C. §§ 1395x(m), (o)**. In March 1987, Hawkeye began participating in Medicare. For the first several years, its headquarters were Horras's basement. In 1990, Hawkeye opened its "home office" at a separate address in Knoxville, Iowa. The company expanded rapidly, from seven part-and-full-time employees in 1991 to nearly 100 in 1993. By 1997, there were more than 500 employees and seven branch offices across Iowa (in addition to Knoxville home office), doing millions of dollars of business every year, the single largest home health provider in Iowa. Horras hired Richards, an accountant, as a part-time employee in August 1991. Within a month, Horras promoted her to Staff Accountant, and then to Comptroller. As Comptroller, her supervisor was a Director of Finance who left in July 1993. Richards then became Director of Finance, with Horras as her supervisor. In 1995, a new Vice President of Operations began supervising Richards for daily operations; Horras continued to supervise Richards for financial issues and cost

reporting. In March 1999, Horras sold Hawkeye to Auxi Health, Inc. Both Horras and Richards left soon thereafter.

In August 1997, acting on separate complaints by a former Hawkeye employee and Horras's ex-wife, the DHHS Inspector General investigated Hawkeye's cost reports. In May 2002, the IG imposed CMPs and assessments against Horras and Richards, excluding them from all federal health care programs. The IG alleged that Horras "submitted or caused to be submitted annual Medicare and Medicaid cost reports covering the periods of 1995 through 1997 that contained 192 items or services that were not related to patient care and/or were not reasonable and proper costs of operation." The IG imposed a $38,000 CMP against Horras, and a $784,072 assessment. The IG alleged that Richards "submitted or caused to be submitted" 124 such claims, imposing a $20,000 CMP and a $100,000 assessment. The IG ordered Horras excluded for seven years, and Richards for five.

In April and May 2003, Horras and Richards had a two-week consolidated hearing with an administrative law judge. In November 2003 (before the ALJ issued a decision), Hawkeye/Auxi settled with the IG for $125,000. In April 2005, the ALJ sustained the IG. As to Horras, the ALJ affirmed the exclusion and the CMP. In consideration of the $125,000 settlement by Hawkeye/Auxi, the ALJ reduced Horras's assessment to $673,212. As to Richards, although her level of knowledge satisfies "the legal standard for violation of the CMPL [Civil Monetary Penalties Law]," the ALJ acknowledged that "these Respondents had different quanta of management responsibilities."

> Nor has the IG shown any motive for Richards' actions which could be traced to cupidity, greed, or the self-aggrandizement so evident in Horras' conduct. Culpability on her part is still present, based on what has been shown to be her reckless disregard or distanced indifference to what was going on around her at Hawkeye; however it moves away from, rather than toward, the degree of culpability which Horras bears.

-3-

The ALJ also noted that Richards fully cooperated with criminal investigators (no charges were brought). For these reasons, and considering Hawkeye's settlement with the IG, the ALJ reduced Richards's exclusion to one year, with a $2,500 CMP and a $2,146 assessment.

Horras and Richards proceeded to the DHHS Departmental Appeals Board appellate division (DAB). The DAB upheld the ALJ's decision: "contrary to the Respondents' contentions, no prejudicial legal error occurred and the ALJ's factual findings are supported by substantial evidence." The DAB rejected "the I.G.'s argument that the exclusion, CMP, and assessment imposed on Richards by the ALJ should be increased." The DAB's decision is identified as the Secretary's "final decision," subject to this court's review. *Cf. Anesthesiologists Affiliated v. Sullivan*, 941 F.2d 678, 680 (8th Cir. 1991) ("The departmental appeals board declined to review the ALJ's decision, which therefore became the final decision of the Secretary of Health and Human Services, and this appeal followed."). Because the DAB affirms and adopts the ALJ's decision, this court also reviews the ALJ's decision as part of the Secretary's final decision. Horras and Richards now appeal to this court.

II.

"The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." **42 U.S.C. § 1320a-7a(e)**. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . the possibility of drawing two conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966). "Therefore, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the

-4-

agency's findings, we must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

The parties offer conflicting interpretations of the Social Security Act, the Civil Monetary Penalties Law, and related DHHS regulations implementing these statutes. This court must determine "whether the proper legal standards were employed" by the DHHS. ***MeadowWood Nursing Home v. United States Dep't of Health & Human Servs.***, 364 F.3d 786, 788 (6th Cir. 2004). "The plain meaning of a statute controls, if there is one, regardless of an agency's interpretation." ***Hennepin County Med. Ctr. v. Shalala***, 81 F.3d 743, 748 (8th Cir. 1996). "If there is ambiguity in a statute that an agency has been entrusted to administer, however, the agency's interpretation is controlling when embodied in a regulation, unless the interpretation is 'arbitrary, capricious, or manifestly contrary to the statute.'" ***Id.*** (quoting ***Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.***, 467 U.S. 837, 843-44 (1984)).

III.

During the period in question (1995 to 1997), Medicare reimbursed HHAs like Hawkeye for the "reasonable cost" of services provided to Medicare recipients. **42 U.S.C. § 1395f(b)**. "The determination of reasonable cost of services must be based on cost related to the care of Medicare beneficiaries." **42 C.F.R. § 413.9(c)(3)**. "However, if the provider's operating costs include amounts not related to patient care . . . such amounts will not be allowable." **Id.**

Medicare providers file annual reports of costs for the past year. **42 C.F.R. pts. 421, 424**. Interim payments are made based on the previous year's costs. **42 C.F.R. pt. 413 et seq**. The cost report reconciles the provider's expenses against the interim payments, and determines the interim payment rate for the following year. **Id.** To help providers like Hawkeye, the Secretary issues a Provider Reimbursement Manual. "The PRM is an extensive set of informal interpretative guidelines and policies

published to assist intermediaries and providers in applying the reasonable cost reimbursement principles." ***Providence Hosp. of Toppenish v. Shalala***, 52 F.3d 213, 218 (9th Cir. 1995). The PRM gives examples of unallowable items and services to illustrate the overarching principle of "related to patient care." Hawkeye was issued a PRM.

The CMPL authorizes the Secretary to impose civil monetary penalties and assessments against "any person that knowingly presents or causes to be presented . . . a claim . . . that the Secretary determines . . . is for a medical or other item or service and the person knows or should know the claim is false or fraudulent." **42 U.S.C. § 1320a-7a(a)(1)(B)**. The Secretary also may exclude such persons "from participation in any Federal health care program." **42 U.S.C. § 1320a-7(b)(7)**. A provider "is considered to have known that the services were not covered" based on "[i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives." **42 C.F.R. § 411.406**. The regulations further explain: "Knowingly" means that "a person, with respect to information, has actual knowledge of information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information, and that no proof of specific intent to defraud is required." **42 C.F.R. 1003.102(e)**. As to "should have known," the statute defines,

> The term 'should know' means that a person, with respect to information,
> > (A) acts in deliberate ignorance of the truth or falsity of the information; or
> > (B) acts in reckless disregard of the truth or falsity of the information,
> and no proof of specific intent to defraud is required.

**42 U.S.C. § 1320a-7a(i)(7)**.

IV.

The Secretary found that Horras "submitted or caused to be submitted" 178 false or fraudulent claims[1], totaling $343,279.97:

- $132,035.86 in professional fees for business valuation and similar expert services related to his divorce
- $44,678.55 in unallowable costs related to personal use of luxury vehicles (including monthly lease payments, automobile expenses, and license fees)
- $1,411 in monthly membership dues to the Embassy Club
- $514.95 for pest control services at his private residence
- $16,013.54 in charitable donations
- $26,937.58 of professional fees for legal and business valuation expenses related to the sale of Hawkeye
- $107,215.64 for marketing program fees to increase patient utilization of Hawkeye services
- $14,472.85 in advertising fees to increase patient utilization of Hawkeye services

A.

Horras argues that "the Hawkeye/Auxi settlement with the OIG precludes this action against Horras in whole or part as a matter of law." The CMPL applies to "[a]ny person (including an organization, agency, or other entity . . .)." **42 U.S.C. § 1320a-7a(a)**. *See also* **42 C.F.R. § 1003.101** ("Person means an individual, trust or estate, partnership, corporation, professional association or corporation, or other entity, public or private."). Hawkeye/Auxi is a person under the CMPL. The regulations for calculating penalties and assessments provide,

---

[1] Following its initial letter to Horras, the IG reduced the number of allegedly improper claims from 192 to 178.

In any case in which it is determined that more than one person was responsible for presenting or causing to be presented a claim as described in paragraph (a) of this section, each such person may be held liable for the penalty prescribed by this part, and an assessment may be imposed against any one such person or jointly and severally against two or more such persons, but the aggregate amount of the assessments collected may not exceed the amount that could be assessed if only one person was responsible.

**42 C.F.R. § 1003.102(d)(1)**.  Under the CMPL, "a principal is liable for penalties, assessments, and an exclusion under this section for the actions of the principal's agent acting within the scope of the agency."  **42 U.S.C. § 1320a-7a(l)**.  *See also* **42 C.F.R. § 1003.102(d)(5)** ("Under this section, a principal is liable for penalties and assessments for the actions of his or her agent acting within the scope of the agency."). Drawing on concepts of vicarious liability and *respondeat superior* from tort law, Horras contends: "The decision of the IG to independently compromise Hawkeye/Auxi's statutory liability was an election to pursue its monetary remedies against Hawkeye/Auxi alone and is a bar to further amounts against Horras."

Horras cites no authority for this proposition.  Common law tort notions of vicarious liability and *respondeat superior* are irrelevant to this issue. Hawkeye/Auxi's liability under the CMPL derives from its status as a person under the CMPL, just as Horras is also a person under the CMPL.  He asserts (without support in the record) that the $125,000 settlement "represents a full and fair settlement of the claims against Hawkeye/Auxi."  But Horras does not argue that "aggregate amount of the assessments [ ] exceed the amount that could be assessed if only one person was responsible," and overlooks that the ALJ *reduced* his assessment in consideration of the settlement.

B.

Horras asserts that a "home office cost report is not an application for payment nor is it seeking payment and thus cannot be considered a 'claim'" under the CMPL.

Instead, Horras explains, "the only potentially false 'claims' were the branch office cost reports submitted to Medicare and Medicaid for the years 1995, 1996, and 1997." These 34 branch office cost reports each contain an allocated share of home office cost reports.

The CMPL defines a claim as "an application for payments for items and services under a Federal health care program." **42 U.S.C. § 1320a-7a(i)(2)**. "The term 'item or service' includes . . . in the case of a claim based on costs, any entry in the cost report, books of account or other documents supporting such claim." **42 U.S.C. § 1320a-7a(i)(3)**. The 178 claims at issue were entries in the home office cost reports, whose totals were allocated to the branch office cost reports, constituting Hawkeye's total claim. Each entry on the home office cost reports results in "an application for payment for items and services" under the CMPL. *See, e.g.*, ***Chapman v. United States Dep't of Health & Human Servs.***, 821 F.2d 523, 525 (10th Cir. 1987) (19 false line-item cost entries on four separate cost reports are 19 false claims; each individual cost report is not counted as a false claim). Horras's argument on this point is without merit.

C.

Horras states that the Secretary did not show that his allegedly false or fraudulent claims were "material." Horras argues that "for 20 of the 34 Medicare and Medicaid branch office cost reports the inclusion or exclusion of the questioned costs from the submitted cost reports made no difference to Hawkeye or the government with respect to how much money Hawkeye would receive." By analogy, Horras cites the federal False Claims Act, under which "only those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered 'claims' within the meaning of the FCA." ***Costner v. URS Consultants, Inc.***, 153 F.3d 667, 677 (8th Cir. 1998). *See generally* **31 U.S.C. § 3729 et seq**.

The CMPL calculates "an assessment of not more than 3 times the amount claimed for each such item or service *in lieu of damages* sustained by the United States or a State agency because of such claim." **42 U.S.C. § 1320a-7a(a)** (emphasis added). The FCA, by contrast, authorizes a $5,000 to $10,000 civil penalty, "plus 3 times the amount of damages which the Government sustains." **31 U.S.C. § 3729(a)**. Unlike the FCA, the CMPL focuses on the amount falsely or fraudulently "claimed." *See generally* **Chapman**, 821 F.2d at 528 ("By authorizing assessments of twice 'the amount claimed' rather than twice 'the amount of damages,' Congress seems to have deliberately shifted the focus away from the actual loss sustained and onto the amount claimed as a basis for assessments."). Proof of loss by the United States is not an element of the CMPL.

D.

Horras believes that the claims are not "false or fraudulent" because they "were in no way concealed in Hawkeye's books or cost reports and were true and accurate costs of Hawkeye." The legal standard, however, is whether the costs are "related to patient care," not whether the item or service is disclosed. *See* **42 C.F.R. § 413.9(c)(3)**. The Secretary found they are not related to patient care, an issue Horras avoids.

To claim an item or service unrelated to patient care is to file a false or fraudulent claim under the CMPL. The PRM instructs providers to file presumptively unallowable costs that the provider thinks should be reimbursed "under protest." "While it is true that a provider may submit claims for costs it knows to be presumptively nonreimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption and seeking reimbursement." **United States v. Calhoon**, 97 F.3d 518, 529 (11th Cir. 1996). Otherwise, the Medicare reimbursement system devolves "into a cat and mouse game in which clever providers could, with impunity, practice fraud on the government." **Id.** Horras's disclosure defense is not persuasive.

-10-

E.

Horras generally challenges the sufficiency of the evidence and offers a "good faith defense," claiming he was an "idea man" who "employed competent people" and "repeatedly relied upon the advice of experts in submitting costs on the cost reports that are at issue in this action."

The ALJ found that Horras "knowingly presented or caused to be presented" the false or fraudulent claims; had "direct first-hand knowledge" that they represent unallowable costs; "acted with reckless disregard of this knowledge when he included or caused to be included" them on Hawkeye's cost reports. Any claim of good faith reliance by Horras is not supported by the record. The DAB concluded, "The ALJ's factual findings are supported by substantial evidence on the record as a whole." Having reviewed the voluminous record, this court agrees. The factual findings are supported by substantial evidence on the record as a whole; further discussion would have no precedential value. *See* **8TH CIR. R. 47(B)**.

F.

According to Horras, the ALJ erred by retroactively applying an amendment from the Balanced Budget Act of 1997. The BBA went into effect January 1, 1998; the cost reports in this case are for the years 1995, 1996, and 1997. Specifically, the BBA states, "Reasonable costs do not include costs for the following: (i) entertainment, including tickets to sporting and other entertainment events; (ii) gifts or donations; (iii) personal use of motor vehicles . . . ." **42 U.S.C. § 1395x(v)(8)**.

But the DAB found that Horras "had ample notice long prior to BBA 1997 that costs such as those enumerated were not considered reasonable for purposes of Medicare reimbursement policy." As with the Secretary's other factual findings, substantial evidence supports this finding. Since 1986, Medicare regulations disallowed costs "not related to patient care." **42 C.F.R. § 413.9(c)(3)**. The

retroactivity of the BBA is irrelevant. The civil monetary penalties, assessment, and exclusion were imposed on Horras under the relevant legal standards in effect for the periods in question.

V.

The Secretary found that in the 1995, 1996, and 1997 cost reports, Richards "presented or caused to be presented" 112 claims[2], totaling $89,040.67:

- $44,678.55 for the unallowable automobile costs
- $1,411 for the monthly Embassy Club dues
- $16,013.54 for the charitable donations
- $26,937.58 for the fees related to the sale of Hawkeye

A.

Richards first argues that she is not a "person" under the CMPL, because "Congress intended the Act to apply to providers and principals of providers." Richards says that the doctrine of *respondeat superior* shields her from liability, because the IG chose to pursue Horras and Hawkeye. Richards also asserts: "Recovering from both Richards and Horras in this case as well as Hawkeye/Auxi will do much more than make the government whole, it will result in unjust enrichment to the government, particularly since the employer has already settled and paid."

The "plain meaning" of the CMPL allow penalties and assessments against "any person." *See* **Hennepin County Med. Ctr.**, 81 F.3d at 748. There is no exception for non-principal employees. Richards cites no authority limiting the statute only to providers or principals. True, when more than one person is liable under the CMPL, "the aggregate amount of the assessments collected may not exceed the amount that could be assessed if only one person was responsible." **42 C.F.R. § 1003.102(d)(1)**.

---

[2] Following its initial letter to Richards, the IG reduced the number of allegedly improper claims from 124 to 112.

-12-

But Richards has no evidence that the government stands to recover more than this maximum.

*Respondeat superior* is a common law doctrine "whereby a master is liable for his servant's torts committed in the course and scope of his employment." **Burger Chef Sys., Inc. v. Govro**, 407 F.2d 921, 925 (8th Cir. 1969). "[T]his doctrine imputes the negligence of the servant to the master and makes the latter liable for the torts of the former. But that liability is joint and several; the servant is not relieved." **Pavelka v. Carter**, 996 F.2d 645, 651 (4th Cir. 1993). As the DAB explained, it does not follow "that because Hawkeye/Auxi is liable for Richards' conduct that Richards is not liable for her own conduct." Neither the recovery from Horras, nor the settlement with Hawkeye/Auxi, protects Richards from liability.

## B.

Richards makes a host of arguments about the evidence itself, claiming no substantial evidence supports the Secretary's factual findings. She notes that almost all the 112 entries are "true and correct entries on Hawkeye's books and correctly characterized on the Home Office Cost Reports." As discussed, disclosure is not a defense under the CMPL. Like Horras, Richards claims she "frequently relied on consultants to insure the proper preparation of the reports." Richards makes no citations to the record to support this claim. Richards also focuses on the Secretary's finding: "The I.G. did not prove by a preponderance of the evidence that Richards had actual, direct, concrete knowledge that most of the claims were improper." On this point, this court considers the four categories of expenses for which Richards was found liable.

## i.

As to automobile expenses, the Secretary's factual findings are based on Richards's familiarity with a decision of the Provider Reimbursement Review Board that cautioned against claiming personal mileage for Medicare reimbursement. For

the earlier 1992 cost report, Richards authored an "audit exposure list" identifying automobile expenses that she anticipated would be adjusted out of the cost reports. This is sufficient to show knowledge under the CMPL.  *See* **42 C.F.R. § 411.406**.

Richards argues at length that there is no "luxury car" rule specifically and categorically prohibiting these types of claims.  But again, the question is whether the costs are "related to patient care."  Substantial evidence on the record supports the conclusion that Richards "knew that the costs related to Horras' personal use of Hawkeye automobiles and the luxury portion of the costs of these automobiles were not allowable Medicare expenditures."

ii.

As to the Embassy Club dues, the Secretary found: "(1) these dues were previously disallowed by the Medicare FI in Hawkeye's 1991 cost report; (2) Richards acknowledged these dues to be one of the expenses that the Medicare FI would disallow, based on the 1991 disallowances, in her 'Audit Exposure List'; and (3) Richards listed these dues as the kinds of personal expenses that were submitted in cost reports in her conversations with Mr. Booth, a representative of Auxi."

These findings – based on substantial evidence – support the Secretary's conclusion that "Richards should have known that the presented costs for Embassy Club dues on Hawkeye's 1995, 1996, and 1997 cost reports were unallowable expenses."  This court agrees that "Richards acted in reckless disregard of this knowledge" by claiming these costs.  *See* **42 U.S.C. § 1320a-7a(i)(7)(B)**.

Richards's claim that Horras used the Embassy Club for business meetings is irrelevant – again, the standard is "related to patient care," not whether it is a business expense for other purposes.  Nor is this court persuaded that $1,411 is *de minimus*. Richards's "good faith" defense on this point is belied by the record.

Regarding the charitable donations, the Secretary found:

> Evidence presented by the I.G. shows that charitable donations were disallowed by the FI in 1993 from Hawkeye's 1991 cost report. Richards listed donations on her 'Audit Exposure List' as an expense she expected to be disallowed from the 1992 cost report. Moreover, Richards attended an exit conference with the FI in 1994 regarding the 1992 cost report in which auditors warned that this was the *third* cost report in which unallowable costs had been included and that Hawkeye must discontinue this practice or risk losing its Medicare funding. Finally, Richards testified that she knew that these costs were disallowed in the past, yet she continued to include them in the 1995, 1996, and 1997 cost reports.

Substantial evidence on the record supports the Secretary's conclusion that "Richards knowingly presented unallowable charitable donations in Hawkeye's 1995, 1996, and 1997 Medicare and Medicaid cost reports."[3] This court agrees that Richards "acted with reckless disregard of this knowledge when she included or caused to be included such costs in Hawkeye's 1995, 1996, and 1997 Medicare and Medicaid cost reports." *See* **42 U.S.C. § 1320a-7a(i)(7)(B)**.

Richards complains "there was <u>no</u> standard for [her] to rely on. Some contributions were allowed, some were not." On the contrary, the applicable legal standard was whether the costs were "related to patient care." That the Balanced Budget Act of 1997 specifically disallowed "gifts or donations" does not prove that Richards never "knew or had reason to know that placing donations on the 1995 or 1996 cost reports was somehow fraudulent."

---

[3] Although the DAB refers only to 1995 and 1996 in the text of its decision, a footnote rejects Richards's challenge to the ALJ's factual finding about charitable contributions on the 1997 cost report.

iv.

Richards disavows all knowledge of the $26,937.58 for fees related to the sale of Hawkeye. The Secretary, however, found that "Richards, in her role as Director of Finance, having been given notice that previous cost report submissions had included unallowable costs specifically related to the sale of Hawkeye, should have known that she was presenting or causing to present improper costs related to the sale of Hawkeye." Richards attended a meeting with Horras where she would have learned the nature of these fees. Richards does not deny preparing the cost reports that included these unallowable costs. By the substantial evidence on the record, Richards "should have known" that these costs were not allowable.

C.

Richards stresses that she was Horras's subordinate, not an owner or manager at Hawkeye. But she forgets the ALJ recognized that she and Horras "had different quanta of management responsibilities" and that she did not act with the "cupidity, greed, or the self-aggrandizement so evident in Horras's conduct." Accordingly, and in recognition of her cooperation with criminal investigators and of the Hawkeye/Auxi settlement, the ALJ reduced her exclusion from five years to one, her CMP from $20,000 to $2,500, and her assessment from $100,000 to $2,146.

VI.

The decision of the Secretary is affirmed.

_____

-16-