# United States Court of Ap peals

## FOR THE EIGHTH CIRCUIT

_____

No. 08-3218

_____

| | | |
|---|---|---|
| Grace Healthcare of Benton, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review of a Final |
| v. | * | Decision of the Secretary of the |
| | * | Department of Health and Human |
| United States Department of Health | * | Services. |
| and Human Services, Centers for | * | |
| Medicare & Medicaid Services, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: April 16, 2009
Filed: December 21, 2009

## _SEE ORDER OF MARCH 31, 2010 AMENDING THIS OPINION_

_____

Before LOKEN, Chief Judge, HANSEN and COLLOTON, Circuit Judges.

_____

LOKEN, Chief Judge.

Grace Healthcare, a skilled nursing facility in Benton, Arkansas, petitions for judicial review of a civil monetary penalty imposed by the Secretary of the Department of Health and Human Services for an "immediate jeopardy" violation of 42 C.F.R. § 483.13(c), which requires nursing homes to thoroughly investigate all allegations of resident neglect or abuse, including injuries of unknown sources. The Secretary's decision to impose a civil monetary penalty is subject to review in the

court of appeals under 42 U.S.C. § 1320a-7a(e). See 42 U.S.C. § 1395i-3(h)(2)(B)(ii).[1] Concluding that the agency's decision to impose an immediate jeopardy monetary penalty is not supported by substantial evidence on the administrative record considered as a whole, we grant the petition for review and vacate that part of the Secretary's decision.

## I. The Regulatory Landscape

To remain eligible for reimbursement for services to patients under the federal Medicare and Medicaid programs, skilled nursing facilities must comply with comprehensive health care regulations enforced by the Centers for Medicare and Medicaid Services (CMS), a division of the Department of Health and Human Services. The statute authorizes the Secretary of Health and Human Services to enter into an agreement with any State pursuant to which an appropriate state agency monitors compliance by skilled nursing facilities with these federal regulations. See 42 U.S.C. § 1395aa. The Office of Long Term Care of the Arkansas Department of Health and Human Services (the "State Agency") is the agency authorized to perform these functions in Arkansas.

State Agency surveyors refer instances of non-compliance with federal standards to CMS for enforcement actions that may result in program disqualification, the imposition of civil monetary penalties, or lesser sanctions. See 42 U.S.C. §§ 1395i-3(h)(2)(B)(ii), 1396r(h)(3)(C)(ii); 42 C.F.R. §§ 488.408, 488.438. A finding of immediate jeopardy exposes the Medicare provider to a broader set of enforcement remedies, including substantially greater civil monetary penalties of $3,050 to $10,000 per day. See 42 C.F.R. §§ 488.408(e)(2)(B)(ii), 488.438(a)(1)(i). The regulations define "immediate jeopardy" as "a situation in which the provider's noncompliance

---

[1]The relevant provisions of 42 U.S.C. § 1395i-3 cited in this opinion are duplicated in 42 U.S.C. § 1396r, which applies more specifically to nursing facilities.

with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." § 488.301.

## II. The Health Care at Issue

Although the administrative proceedings encompassed many more factual issues, this appeal is focused on care provided by Grace Healthcare to a Medicare beneficiary referred to as Resident #1, who resided at Grace Healthcare for about thirty days in the spring of 2006. Resident #1 was an 86-year-old woman first admitted on April 4, in declining health. As described by a treating physician, Resident #1 had a history of ASHD, congestive heart failure, chronic obstructive pulmonary disease, increasing Alzheimer's dementia, hypertension, rectal bleeding from internal hemorrhoids, and diverticulitis. Two days later, she was transferred to Saline Memorial Hospital after a stroke, returning to Grace Healthcare on April 11 in a more deteriorated condition. Because of the stroke, she was placed on Plavix, a potent blood thinner, in addition to her other medications. Grace Healthcare's Admission Nursing Assessments on both April 4 and 11 noted bruises on Resident #1's arm at the sites of IV infusions and blood draws.

On May 7, 2006, Grace Healthcare's Daily Skilled Nurses Notes record that Resident #1 "has developed low grade fever and golf ball sized lymph node on [right] side of neck," and that she had bit her tongue and the inside of her lip. Resident #1 was promptly transferred to Saline Memorial Hospital, where the emergency room physician recorded a urinary tract infection; elevated blood sugar consistent with hyperosmolar state; renal insufficiency with dehydration; multiple ecchymoses;[2] Alzheimer's dementia; hypertension; and coronary artery disease.

---

[2]"Ecchymoses" are "purplish patch[es] caused by extravasation of blood into the skin." Stedman's Medical Dictionary 606 (28th ed. 2006).

On May 7, Dr. Quade, a treating physician at the hospital, noted Type II Diabetes Mellitus, a new diagnosis; she also noted the multiple ecchymoses without referencing possible abuse or neglect. However, the next day, Grace Healthcare's nurse liaison overheard Dr. Quade complaining at the hospital about Resident #1's dehydrated and bruised condition. The nurse liaison inquired, and Dr. Quade said she wanted to talk to someone at Grace Healthcare about Resident #1's bruises, which were not present when Resident #1 left the hospital on April 11.[3] The nurse liaison promptly reported Dr. Quade's comment to Grace Healthcare's Director of Nurses and Administrator. The Director of Nurses called Dr. Quade, as requested. Dr. Quade never returned the call. The Administrator interviewed several nurses and consulted Resident' #1's medical records. Resident #l died at the hospital three days later. Both Grace Healthcare's treating physician and its medical expert later opined that Resident #1's ecchymoses were caused by the administration of Plavix and aspirin, not by injury or accident.

## III. The Administrative Proceedings

Acting on a complaint, apparently from Resident #1's family, the State Agency began a complaint and compliance survey of Grace Healthcare's facility on May 15, 2006. See 42 U.S.C. §§ 1395i-3(g)(1)(C) and (2). As relevant here, the detailed surveyor interview notes[4] reflect that one Certified Nurse Aide recalled seeing bruises on Resident #1's arms on May 4 and another recalled seeing "a little bruise on her right hip that was about the size of an egg" on May 5. Resident #1's condition changed dramatically on the morning of May 7. When interviewed nine days later, attending staff noted multiple bruises on her legs, bottom, right side of her chest, and

---

[3]Nearly 30 days had elapsed since Dr. Quade last saw Resident #1 at the hospital. During that period, she was placed on Plavix after treatment of her stroke.

[4]As Grace Healthcare waived its right to an in-person hearing, see Crestview Parke Care Ctr. v. Thompson, 373 F.3d 743, 748-50 (6th Cir. 2004), the administrative record contains only surveyor interview notes.

-4-

left side of her upper arm. One nurse aide recalled that during the 6:00 a.m. rounds that morning, Resident #1 had "more bruises than I've ever seen on a person." The nurse liaison reported what Dr. Quade said at the hospital on May 8. The nurse liaison stated that she then reported what she thought was "an allegation of bruising and dehydration" to Grace Healthcare's Director of Nursing and Administrator.

On the afternoon of May 17, the State Agency informed Grace Healthcare that its care of Resident #1 and two other residents reflected non-compliance with six federal regulations, resulting in an "immediate jeopardy" condition.[5] The following afternoon, with the survey not yet completed, the State Agency removed the immediate jeopardy condition after Grace Healthcare implemented a comprehensive Plan of Removal that addressed compliance with each of the six regulations.

After completing its survey on May 25, the State Agency recommended that CMS take enforcement action against Grace Healthcare and impose civil monetary penalties of $3,500 per day for the May 17-18 immediate jeopardy violations, plus an additional $350 per day "until the facility is in substantial compliance." CMS agreed with these recommendations and notified Grace Healthcare by letter dated June 14, 2006, that it was not in substantial compliance, that the monetary penalties were being assessed, and that other remedies would be imposed unless the facility came into substantial compliance.

CMS subsequently determined that Grace Healthcare achieved substantial compliance on June 23, 2006. CMS rescinded the threatened additional remedies but imposed civil monetary penalties of $3,500 per day for May 17-18 and $350 per day

---

[5]The cited regulations were 42 C.F.R. §§ 483.10(b)(11) -- duty to notify physician and family of significant change in condition; 483.13(c) -- duty to investigate and report staff mistreatment; 483.20(k) -- duty to develop comprehensive care plans; 483.25 -- quality of care -- and 483.25(j) -- proper hydration; and 483.75 -- effective and efficient administration of the facility.

from May 19 through June 23. As a result of the immediate jeopardy findings, Grace Healthcare would also lose its authority to conduct a Nurse Aide Training and Competency Evaluation Program. See 42 C.F.R. § 483.151(b)(2)(iii). Grace Healthcare conceded the $350 per day sanction for the period May 19-June 23 but filed an administrative appeal of the six immediate jeopardy determinations. See 42 C.F.R. Part 498. A Department of Health and Human Services administrative law judge (ALJ) decided the appeal on a record consisting of voluminous documentary evidence and extensive briefs submitted by both parties.

Though Grace Healthcare challenged all six immediate jeopardy findings, the ALJ upheld the $3,500 per day penalty on the sole ground that Grace Healthcare committed immediate jeopardy violations of 42 C.F.R. § 483.13(c)(2)-(4)[6] when several members of its staff observed bruises on Resident #1 between May 4 and 7, 2006, but the facility did not investigate the source of these injuries during that period. The ALJ concluded that this failure to investigate Resident #1's "obvious -- and extreme -- external injuries over a three day period" violated Grace Healthcare's "absolute duty to treat every resident injury from an unknown source as evidence of possible abuse, neglect, or mistreatment, until it establishes the injury's cause." The violation warranted an immediate jeopardy determination and penalty because it "potentially put Resident #1 at risk of great harm" and "put all of Petitioner's residents at risk." The ALJ did not address the other five immediate-jeopardy-level deficiencies because the failure to investigate possible staff abuse "is, in and of itself, sufficient to justify the low-end penalties of $3,500 per day."

---

[6]These regulations provide that a skilled nursing facility must ensure that all allegations of abuse or neglect are reported to the facility's administrator and to other officials in accordance with state law; preserve evidence that all allegations of abuse are thoroughly investigated; and promptly report the results of investigations to the facility's administrator and to other officials in accordance with state law within 5 working days of the incident.

Grace Healthcare appealed the ALJ's decision to the agency's Departmental Appeals Board (DAB), again arguing that CMS failed to prove any immediate-jeopardy-level violation. Grace Healthcare noted an error in the ALJ's factual analysis of the alleged failure to investigate the source of Resident #1's multiple bruises before she was transferred to the hospital on May 7. The administrative record is clear that the "obvious -- and extreme" multiple bruises referred to by the ALJ were not apparent until the morning of May 7, just before Resident #1 was transferred to the hospital's emergency room suffering from far more serious changes of condition that proved to be the onset of her demise. Beyond what was observed that morning, the surveyors' interview notes show only that two nurse aides recalled less significant and extensive bruises on May 4 and May 5, which other staff did not recall seeing. Yet the ALJ's opinion repeatedly treated the bruises first observed on May 7 -- which two physicians later described as multiple ecchymoses attributable to Resident #1's medication with aspirin and a potent blood thinner -- as a three-day condition of unknown source which required immediate and thorough investigation. Even if § 483.13(c)(2)-(4) required prompt investigation of the bruises observed on May 4 and May 5 for possible staff abuse, nothing in the administrative record suggests that the State Agency and CMS would have imposed an immediate-jeopardy-level penalty solely for that non-compliance.

No doubt recognizing this factual flaw in the ALJ's analysis, the DAB affirmed by finding a significantly different immediate-jeopardy-level violation of § 483.13(c), one not identified or relied upon by the ALJ. Though Dr. Quade did not report possible abuse to regulatory officials, nor record possible abuse in her physician's notes, the DAB concluded that Dr. Quade's statement to Grace Healthcare's nurse liaison on May 8 about Resident #1's bruises -

> was an allegation of facts that could indicate abuse. In addition, Dr. Quade appeared to consider the bruises an injury of unknown source . . . . Accordingly, even if Grace's staff did not see the bruises until just

prior to Resident #1's transfer to the hospital, Grace was still obligated to investigate the bruises after receiving Dr. Quade's allegation of abuse.

The DAB further agreed with the ALJ that the treating physician's June 30 letter opining that the bruises were ecchymoses attributable to Plavix and aspirin medications did not satisfy Grace Healthcare's duty under § 483.13(c) to promptly investigate injuries of unknown source. The DAB affirmed the ALJ's finding of an immediate-jeopardy-level violation on the ground that Grace Healthcare failed to prove it was clearly erroneous, see 42 C.F.R. § 498.60(c)(2), and concluded the ALJ had discretion to ignore the other five immediate jeopardy determinations because they were immaterial to the outcome of the case, citing W. Care Mgmt. Corp. v. Ctrs. for Medicare & Medicaid Servs., D.A.B. No. 1921, 2004 HHSDAB LEXIS 73 (2004). Finding the $3,500-per-day penalty reasonable in amount, the DAB affirmed the ALJ's decision. Grace Healthcare then filed this petition for review.

## IV. Judicial Review

Grace Healthcare challenges the DAB's determination that Grace Healthcare was not in substantial compliance with 42 C.F.R. § 483.13(c), the determination that any noncompliance resulted in immediate jeopardy, and the decision not to address the other five deficiencies underlying CMS's immediate jeopardy determination.

**A. General Principles.** Judicial review of an order imposing a civil monetary penalty is governed by 42 U.S.C. § 1320a-7a. See §§ 1395i-3(h)(2)(B)(ii), 1396r(h)(3)(C)(ii). The statute provides that the DAB's findings must be supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Horras v. Leavitt, 495 F.3d 894, 900 (8th Cir. 2007) (quotation omitted). Because the regulations prescribe substantially greater monetary penalties for noncompliance that caused an immediate jeopardy condition, the DAB's immediate jeopardy finding, as well as its noncompliance findings and the amount of the penalty imposed, must be supported by substantial evidence on the

administrative the record as a whole. See Fairfax, 300 F.3d at 842. In conducting its appellate review, the DAB has held that CMS's obligation to present a prima facie case of noncompliance does not extend "to the issue of the level of noncompliance." Liberty Commons Nursing & Rehab Ctr.-Johnston v. Ctrs. for Medicare & Medicaid Servs., D.A.B. No. 2031, 2006 HHSDAB LEXIS 105, at *35 (2006), aff'd, 241 Fed. App'x 76, 79-81 (4th Cir. 2007) (unpublished). That self-imposed limitation on administrative review does not affect our review of the agency's immediate jeopardy determination, which is governed by the familiar substantial evidence standard.

In selecting an appropriate remedy, CMS must consider whether a facility's deficiencies constitute immediate jeopardy; whether they are isolated, constitute a pattern or are widespread; and the facility's prior history of noncompliance. 42 C.F.R. § 488.404. In determining the amount of a civil monetary penalty, CMS must also consider the facility's financial condition and degree of culpability. 42 C.F.R. § 488.438(f). See generally Corder v. United States, 107 F.3d 595, 597-98 (8th Cir. 1997) (noting that civil monetary penalties are quasi-criminal sanctions). A finding of immediate jeopardy -- noncompliance that "has caused, or is likely to cause, serious injury, harm, impairment or death to a resident," 42 C.F.R. § 488.301-- must obviously be based upon the specific instance(s) of noncompliance at issue. As the DAB said in Spring Meadows Health Care Ctr. v. Ctrs. for Medicare & Medicaid Servs., D.A.B. No. 1966, 2005 HHSDAB LEXIS 35, at *71 (2005), "Because the definition of 'immediate jeopardy' requires that there be some causal connection between the facility's noncompliance and the existence of serious injury or a threat of injury, the nature and circumstances of the facility's noncompliance are of obvious importance to the evaluation."

**B. The Immediate Jeopardy Determination in This Case.** Before completing its compliance survey, the State Agency declared that Grace Healthcare's interrelated noncompliance with six regulations in caring for three residents resulted in an immediate jeopardy condition. Twenty-five hours later, the State Agency determined that Grace Healthcare had remedied the condition with a comprehensive Plan of

Removal but nonetheless recommended an immediate-jeopardy-level monetary penalty. CMS agreed and imposed a $3,500 per day civil monetary penalty for the six immediate-jeopardy-level violations. In an affidavit filed with the ALJ, the Compliance Evaluation Lead of CMS Region VI discussed the six deficiencies and opined: "the multiple failures combined with the physical condition of Residents #1, #2, or #3 were likely to cause them serious injury, harm, impairment or death."

The Evaluation Lead's affidavit further explained that Grace Healthcare's "interacting" noncompliance with 42 C.F.R. §§ 483.20(k), 483.25, and 483.25(j) were "the resident-centered core of Grace Healthcare's noncompliance." Grace Healthcare identified Resident #1's potential hydration problem, the affidavit explained, but "failed to assess, or disregarded, the seriousness of too little or too much fluid." Resident #1 received a diuretic, which increased the likelihood of dehydration, and Plavix, a blood thinning medication which could cause bleeding. "The bruises and bleeding are indicators of possible neglect or abuse," the affidavit explained, citing 42 C.F.R. § 483.13(c). "But bleeding also would aggravate Resident #1's hydration needs," which affected her bowel impaction and heart problems. The affidavit's brief discussion of the § 483.13(c) noncompliance did not assert or even imply that this deficiency alone resulted in an immediate jeopardy condition.

If the ALJ and the DAB had affirmed these interrelated immediate jeopardy findings, we would be presented with a far different appeal. But on appeal Grace Healthcare challenged each of the CMS immediate jeopardy findings. For example, it placed in evidence expert medical testimony and facility records documenting Resident #1's fluid intake during her time at the facility and vigorously argued that, if Resident #1 was dehydrated when she left Grace Healthcare on May 7, that condition was not caused by any deficiency in Grace Healthcare's care. Grace Healthcare also attacked the factual basis for the other findings, directly contradicting CMS's assertion that these multiple deficiencies were likely to cause Resident #1 (or any other resident) serious injury, harm, impairment, or death.

The ALJ did not address these issues, instead asserting without discussion that Grace Healthcare did not meet its burden to prove CMS's immediate jeopardy findings clearly erroneous.[7] The ALJ then ruled that the failure to investigate Resident #1's multiple bruises during the May 4-7 period created "an obvious likelihood of serious injury, harm, or death" because "any physical abuse might have been lethal." As this analysis was not adopted by the DAB, it is not the final agency action we must review. But if the DAB's ambiguous opinion adopted (in conclusory fashion) the ALJ's analysis, as the government seems to argue to this court, we have no difficulty concluding that the analysis is not supported by the administrative record. As we have explained, the ALJ's finding that Resident #1 exhibited multiple bruises that were "obvious -- and extreme -- external injuries" prior to the morning of May 7 is unsupported by the facility's contemporaneous treatment records and flatly contradicted by the surveyors' interview notes. There is no determination in the record -- by the State Agency surveyors, the CMS evaluators, the ALJ, or the DAB -- that the lesser bruises observed on May 4 and 5 created an immediate jeopardy condition, even if they were "injuries of unknown source" within the meaning of § 483.13(c)(2). Thus, the ALJ's immediate jeopardy finding lacks record support.

---

[7]Once CMS presents a prima facie case of noncompliance, the DAB places the burden on the provider appealing a civil monetary penalty to "prove by a preponderance of the evidence on the record as a whole that it is in substantial compliance with the relevant statutory and regulatory provisions." Cross Creek Health Care Ctr. v. Health Care Fin. Admin., D.A.B. No. 1665, 1998 HHSDAB LEXIS 65, at *26 (1998). Two circuits have declined to address challenges to this burden of proof rule because the evidence was not in "equipoise" in those cases. See Batavia Nursing & Conv. Ctr. v. Thompson, 143 Fed. App'x 664, 665 (6th Cir. 2005) (unpublished); Fairfax Nursing Home, Inc. v. U.S. Dep't. of Health & Human Servs., 300 F.3d 835, 840 n.4 (7th Cir. 2002). The issue is not raised in this case. We note that the statutes authorizing the Secretary to impose civil monetary penalties trigger the formal adjudication requirements of the Administrative Procedure Act. See Crestview, 373 F.3d at 748. The APA provides that, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). See generally Steadman v. SEC, 450 U.S. 91, 98-102 (1981).

-11-

Like the ALJ, the DAB addressed only one immediate-jeopardy-level issue, Grace Healthcare's alleged noncompliance with 42 C.F.R. § 483.13(c)(2)-(4) for failing to investigate the source of bruises observed on Resident #1. However, abandoning the ALJ's focus on the entire May 4-7 period, the DAB relied on Dr. Quade's comment to Grace Healthcare's nurse liaison about the bruises on May 8, basing its decision that Grace Healthcare violated § 483.13(c) on the failure to investigate this "allegation of abuse." Grace Healthcare raises factual challenges to this analysis as well. First, there is undisputed evidence that Grace Healthcare *did* investigate Dr. Quade's comment. After the nurse liaison reported the comment to Grace Healthcare's Director of Nurses and Administrator, the Director of Nurses called Dr. Quade, as she had requested. Dr. Quade never returned the call. The Administrator interviewed several nurses and consulted Resident' #1's medical records. As the DAB ignored these uncontroverted facts, its finding that Grace Healthcare failed to investigate an allegation of abuse supposedly made by Dr. Quade is debatable.

Second, the administrative record casts some doubt on the DAB's finding that Dr. Quade made an allegation of abuse. The CMS Evaluation Lead's affidavit made no mention of Dr. Quade's comment. The ALJ referred to Dr. Quade telling a Grace Healthcare staff member that Resident #1 did not have bruises prior to her admission to Grace Healthcare, but the ALJ did not find that this comment constituted an allegation of abuse triggering Grace Healthcare's duties under § 483.13(c). The regulation understandably defines allegations of abuse to include "injuries of unknown source," § 483.13(c)(2), and Dr. Quade certainly raised an issue of that nature. But the extent of the required investigation is necessarily fact specific. Here, neither Dr. Quade -- who must report suspected abuse under Arkansas law -- nor the hospital contacted authorities regarding Resident #1's condition upon admission to the hospital on May 7, and Dr. Quade never returned the Director of Nursing's call. When we add the fact that the bruises first observed on the morning of May 7 could not have been investigated before Resident #1 was transferred to the hospital, and the subsequent medical opinions that the extensive bruises were ecchymoses attributable to Resident

#1's Plavix and aspirin medications, Grace Healthcare's limited investigation after learning of Dr. Quade's concern becomes more defensible.

If the issue before us was whether Grace Healthcare was guilty of a low-level violation of § 483.13(c) because its nursing staff was remiss in failing to report the relatively minor bruises observed on May 4 and 5,[8] and in not investigating more vigorously Dr. Quade's report of bruises of unknown source on May 8, substantial evidence would doubtless support the DAB's decision. As the DAB and the ALJ explained, physical abuse of nursing home residents by the facility's staff exposes residents to serious harm and can be difficult to detect, so even allegations of abuse that prove to be unfounded must be immediately reported and thoroughly investigated. But the critical issue in this case is the immediate jeopardy finding, that is, whether Grace Healthcare's failure to more vigorously investigate Dr. Quade's May 8 comment to the nurse liaison "caused, or [was] likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301.

In affirming the ALJ's immediate-jeopardy-level finding, the DAB concluded "[t]here was a sufficient causal connection between the noncompliance . . . and the likelihood of serious harm because . . . any abuse of a frail nursing home resident can be lethal." Taken literally, that would mean that every violation of § 483.13(c) is an immediate-jeopardy-level violation, an arbitrary ruling because it is contrary to the DAB's decision in Spring Meadows, 2005 HHSDAB LEXIS 35, at *73-74.

The State Agency and CMS based their immediate-jeopardy-level charges on six interrelated deficiencies. The CMS Evaluation Lead's affidavit made it clear that the alleged § 483.13(c) deficiency was *not* "the resident-centered core of Grace Healthcare's noncompliance." In effect, the ALJ and the DAB convicted Grace Healthcare of an immediate-jeopardy-level violation that was not charged. Yet the DAB made no fact-specific analysis of the immediate jeopardy issue and cited no facts

_____

[8]In footnote 3 of its opinion, the DAB noted but declined to decide this issue.

-13-

in the record raising an inference that Grace Healthcare's failure to investigate Dr. Quade's comment more promptly or more thoroughly increased the risk of abuse, neglect, or mistreatment of Resident #1 or its other residents.

In these circumstances, the DAB's finding of the likely harm necessary to warrant an immediate-jeopardy-level finding was based on pure speculation and not supported by substantial evidence in the administrative record as a whole. Moreover, the DAB's perfunctory distinguishing of Spring Meadows as "based on the particular circumstances of that facility's noncompliance" means that its immediate jeopardy determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); see Minnesota v. Ctrs. for Medicare & Medicaid Servs., 495 F.3d 991, 998 (8th Cir. 2007) (unexplained departure from prior agency practice is arbitrary and capricious). To withstand judicial review under this standard, an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983). The DAB failed to meet that standard. Therefore, the Secretary's immediate-jeopardy-level determination, and the $3,500 per day monetary penalty warranted only by that determination, must be set aside.

**C. A Loose End.** Grace Healthcare argues that the DAB's decision was arbitrary and capricious because the DAB ignored the other five immediate jeopardy findings that Grace Healthcare appealed. In rejecting this argument, the DAB invoked its general rule that the ALJ's hearing "is a de novo proceeding . . . not a quasi-appellate review of the correctness of [CMS's] determination," and therefore the ALJ need not address CMS noncompliance findings that are not material to the ALJ's decision. W. Care Mgmt., 2004 HHSDAB LEXIS 73, at *32, 40. We need not review the soundness of that principle, other than to conclude it was misapplied in this case. However, Grace Healthcare also asserted, and at oral argument counsel for the government did not deny, that unreviewed CMS findings of immediate jeopardy remain accessible to the public and can be used to support damage claims against the

provider in private litigation. If true, that is a material adverse impact, in which case all findings of immediate jeopardy that are appealed should either be upheld or reversed by the ALJ or the DAB or be expunged from the agency's public records.

## V. Conclusion

For the foregoing reasons, we grant the petition for review and vacate that portion of the DAB's order upholding the finding of an immediate-jeopardy-level violation and the imposition of a $3,500 per day civil monetary penalty against Grace Healthcare. The Secretary is directed to expunge all references to findings or determinations of immediate-jeopardy-level noncompliance by Grace Healthcare with respect to this litigation and to Survey ENF-06-0568 from the Department's and CMS's agency records that are accessible or available by any method or means to the public (and shall also insure that its contract surveyor does the same). We leave to the agency to decide in the first instance whether further adjudicative proceedings against Grace Healthcare are warranted and appropriate.

_____