**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PLOTT NURSING HOME, *Petitioner*, | No. 12-70174 |
| v. | HHS No. A-11-66 |
| SYLVIA MATHEWS BURWELL,* Secretary of the United States Department of Health and Human Services, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Department of Health & Human Services

Argued and Submitted
October 11, 2013—Pasadena, California

Filed March 3, 2015

Before: Andrew J. Kleinfeld and Morgan Christen, Circuit
Judges, and John W. Sedwick, District Judge.**

Opinion by Judge Kleinfeld;
Partial Concurrence and Partial Dissent by Judge Christen

---

* Sylvia Mathews Burwell is substituted for her predecessor, Kathleen Sebelius, as Secretary of the United States Department of Health and Human Services. Fed R. App. P. 43(c)(2).

** The Honorable John W. Sedwick, District Judge for the U.S. District Court for the District of Alaska, sitting by designation.

## SUMMARY[***]

### Medicare Act

The panel reversed in part the Secretary of Health and Human Services' imposition of a civil monetary penalty for violations of the Medicare Act's standards of care for nursing home patients, and remanded.

The panel affirmed the Secretary's determination that the Plott Nursing Home in California violated the quality of care for bed sores, reversed the Secretary's determination that the nursing home violated the quality of care for urinary tract infection, and held that the nursing home was entitled to administrative review of all cited deficiencies and a remand with directions to review or dismiss the violations that were not reviewed by the agency.

The panel also held that regarding the public website, the agency need not afford review before survey results were posted, but must allow review and correction as required by the Medicare Act. The panel remanded to the Department of Health and Human Services Appeals Board to review or dismiss the unreviewed and appealed deficiencies alleged, and to reconsider the civil money penalty assessed against the nursing home.

Judge Christen concurred with the majority's holding concerning the two deficiencies that formed the basis for the $500 per day penalty (bed sores and urinary tract infection).

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Christen dissented from Part C of the majority's analysis concerning the holding as to the unreviewed deficiencies.

## COUNSEL

Joseph L. Bianculli, Health Care Lawyers, PLC, Arlington, Virginia; Elizabeth Plott Tyler and Terry Schneier, Tyler & Wilson, Los Angeles, California, for Petitioner.

Helen L. Gilbert and Michael S. Raab, Attorneys, Stuart F. Delery, Acting Assistant Attorney General, Department of Justice, Washington, D.C.; William B. Schultz, Acting General Counsel, Ann Hall, Chief Counsel, Region IX, and Claire D. Chazal, Assistant Regional Counsel, Department of Health and Human Services, San Francisco, California, for Respondent.

**OPINION**

KLEINFELD, Senior Circuit Judge:

Plott Nursing Home ("Plott") petitions for review of a civil money penalty imposed by the Secretary of the United States Department of Health and Human Services for Plott's violations of the Medicare Act's standards of care for nursing home patients.

*I. The Regulatory Scheme*

Skilled nursing facilities that participate in the federal Medicare and Medicaid programs must satisfy minimum standards of patient care in order to receive reimbursement for patient services.[1] The Centers for Medicaid and Medicare Services ("CMS"), a division of the United States Department of Health and Human Services, contracts with state agencies to conduct unannounced compliance surveys of participating skilled nursing facilities.[2] The surveys must be performed at least every 15 months.[3] Most surveyors are Health Facilities Evaluator Nurses (HFENs). To become qualified as an HFEN in California, an individual must be a registered nurse and have one year of nursing experience, and six months of nursing supervisory experience.[4] A Master's Degree in a health-related field can be substituted for the required nursing

---

[1] 42 U.S.C. § 1395i-3(a)–(d); 42 C.F.R. § 483, § 483.25.

[2] *See* 42 U.S.C. § 1395aa.

[3] 42 U.S.C. § 1395i-3(g)(2)(A)(iii).

[4] California Department of Public Health Website, *available at* http://www.cdph.ca.gov/services/jobs/Pages/HFENJobs.aspx.

experience and a Bachelor's of Science degree in Nursing can be substituted for the required supervisory experience.[5]  All successful applicants must score at least 70% on the HFEN Training and Experience Examination.[6]  Among other subjects, the examination tests knowledge of health facilities and services regulations, standards of patient care, medical terminology, techniques of health facility management, and investigative methods.[7]  Survey teams may also include surveyors with specialized knowledge, such as dieticians and pharmacists.  CMS guidance requires the number of surveyors be assigned based on the size of the facility, the history of non-compliance, the existence of special care units and the need for inexperienced surveyors to accompany experienced surveyors as part of their training.[8] All surveyors assigned to a facility should have received the required training, and at least one member of the team should be a registered nurse.[9]

Surveyors record violations, otherwise known as "deficiencies" and rate them as to scope and severity.  The deficiencies are then referred to CMS for various enforcement

---

[5] *Id.*

[6] Job Description for California Department of Public Health (CDPH) Health Facilities Evaluation Nurse, *available at* https://jobs.ca.gov/ JOBSGEN/6PB64.PDF.

[7] *Id.*

[8] *CMS Publication 100-07, State Operations Manual*, Chapter 7, §7201.1 [hereinafter *SOM*] *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS1201984.html?DLPage=1&DLSort=0&DLSortDir=ascending.

[9] *Id.* at Chapter 7, §7201.2.

actions, including program disqualification, temporary management, denial of reimbursement payments, state monitoring, transfer of residents, closure of the facility, directed plans of correction and training, and civil money penalties.[10]  Before imposing a remedy, CMS must consider the scope and severity of a deficiency, the relationship of the deficiencies to each other, and the facility's prior history of noncompliance.[11]    If a facility is cited for deficiencies reflecting a substandard quality of care during three consecutive surveys, CMS must deny reimbursement payments and monitor the facility.[12]

In this case, the state surveyors cited Plott for deficiencies and CMS imposed a civil money penalty.  CMS may impose "per day" or "per instance" civil money penalties based on a deficiency's scope and severity.[13]  The penalties start at $50 per day, and are imposed in $50 increments.[14]    For deficiencies of lesser severity, CMS may impose penalties ranging from $50 to $3,000 per day.[15]  For deficiencies with the highest severity rating of "immediate jeopardy" the facility may be fined $3,050 to $10,000 per day.[16]  If penalties

---

[10] 42 C.F.R. § 488.408.

[11] *Id.* § 488.404.

[12] 42 U.S.C. § 1395i-3(h)(2)(E).

[13] *Id.* §§ 1395i-3(h)(2)(A)(ii), (h)(2)(B)(ii); 42 C.F.R. 488.438(a)(1)(ii).

[14] 42 C.F.R. § 488.438.

[15] *Id.* § 488.438(a)(1)(ii).

[16] *See id.* §§ 488.301, 488.408(e)(2)(ii), 488.438(a)(1)(i).

are imposed per instance, instead of per day, the permissible range is $1,000 to $10,000.[17]

The penalty must be "reasonable."[18] In setting the civil money penalty amount, CMS must take into account several factors, including the scope and severity of the deficiency, the facility's history of noncompliance, repeated deficiencies, the facility's financial condition, and the facility's degree of culpability.[19] The statute directs CMS to "provide for the imposition of incrementally more severe fines for repeated or uncorrected deficiencies."[20]

Nursing facilities are entitled to a hearing before an administrative law judge ("ALJ") to challenge civil money penalties.[21] CMS has the initial burden of proving a prima facie case of noncompliance. Then the burden switches to the facility to prove, by a preponderance of the evidence, that they were in "substantial compliance."[22] "Substantial compliance" means a level of noncompliance such that "any

---

[17] *Id.* § 488.438(a)(2).

[18] *Emerald Oaks*, D.A.B. No. 1800, at 7 (2001).

[19] 42 C.F.R. §§ 488.404(b), 488.438(f).

[20] 42 U.S.C. § 1395i-3(h)(2)(B)(iii).

[21] *Id.* § 1395i-3(h)(2)(B)(ii) (incorporating 42 U.S.C. 1320a-7a(c)(2)).

[22] *Batavia Nursing & Convalescent Ctr.*, D.A.B. No. 1904, at 5–6 (2004).

identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm."[23]

A facility may appeal the ALJ's decision to the Department of Health and Human Services Appeals Board ("Board"), which reviews the ALJ's findings for substantial evidence on the record as a whole. The Secretary has delegated to the Board her "authority to make final decisions on review of . . . decisions of Administrative Law Judges involving enforcement actions, including . . . civil money penalties."[24]   "Any person adversely affected by a determination of the Secretary" may appeal the Board's decision to a United States Court of Appeals.[25]

## II. Plott's 2008 Surveys

Plott Nursing Home is a Medicare and Medicaid participating skilled nursing facility in California.   On September 24, 2008, the California Department of Public Health conducted an unannounced survey of Plott.   Ten surveyors completed the survey.   Eight of Plott's surveyors were HFENs, one was a registered dietician, and one was a Health Facilities Evaluator Supervisor (HFES).[26]

---

[23] 42 C.F.R. § 488.301.

[24] 58 Fed. Reg. 58,171.

[25] 42 U.S.C. 1395i-3(h)(2)(B)(ii); 42 U.S.C. 1320a-7a(e).

[26] A HFES is a supervisor that has the same qualifications as an HFEN, but also has work experience as an HFEN.  Job Description for California Department of Public Health (CDPH) Health Facilities Evaluation Nurse *available at* http://www.cdph.ca.gov/services/jobs/Documents/HFEIISup8H1AT.pdf

During compliance surveys, state surveyors identify categories of deficiencies with a "Tag" designation.[27] The "Tag" identifies the regulatory provision allegedly violated.[28] Each Tag also has an accompanying alphabetical scope and severity code ranging from A to L.[29]

Scope and severity levels A through C indicate that the cited deficiency poses no actual harm and has a potential for minimal harm. Levels D through F indicate the deficiency poses no actual harm, but has the potential for more than minimal harm. Levels G through I indicate that the deficiency poses actual harm that does not rise to immediate jeopardy. Levels J through L indicate that the deficiency poses immediate jeopardy to resident health or safety. In each of the four alphabetical levels, the lowest letter indicates the deficiency is "isolated," the middle letter indicates that there is a "pattern" of the deficiency, and the highest letter indicates that the problem is "widespread." Facilities whose deficiencies do not rise beyond a C in scope and severity are considered in substantial compliance. No penalty is imposed for facilities who are found to be in substantial compliance.[30]

In September 2008, the surveyors cited Plott for 33 different Tag numbered deficiencies above a D in scope and severity. Four of the 33 were a G, H, or I, (actual harm, but not immediate jeopardy) the rest were a D, E or F (no actual

---

[27] *See SOM*, *supra* note 8, at Appendix PP – Guidance to Surveyors for Long Term Care Facilities.

[28] *Id.*

[29] *Id.* at Chapter 7, § 7400.5.1.

[30] 42 C.F.R. § 488.402(d)(2).

harm, but potential for minimal harm.) A follow-up survey in December 2008 found one additional D level deficiency. The state agency referred all 34[31] deficiencies to CMS. Based on the 33 September deficiencies, CMS fined Plott $500 per day from September 24 through December 3, 2008, and $100 per day from December 4 through December 15, 2008 for the one December deficiency.

Plott requested an ALJ hearing to dispute the results of both surveys. The ALJ consolidated the two proceedings and noted at the beginning of the hearing that many of the surveyors only had two years of surveying experience, and that there was a large number of "low level" deficiencies. He said "my initial impression is a lot of these deficiencies are very finely honed. They are very pointed deficiencies . . . usually I see gross problems." After a four-day evidentiary hearing, the ALJ upheld the entire penalty imposed by CMS on the basis of three deficiencies for three different patients, two during the September 2008 survey and one during the December 2008 survey. During the September survey, Plott's care of Resident Six violated the standard of care for bed sores,[32] and Plott's care of Resident Five violated the standard

---

[31] Plott states in their brief that they were cited for 96 deficiencies. This is because some of the 34 Tag coded deficiencies cited in the two surveys applied to more than one patient. Plott counts every occurrence of the alleged deficiency where the surveyors counted the code once and the scope and severity code takes into account instances where the deficiency applied to more than one patient.

[32] 42 C.F.R. § 483.25(c) "Pressure Sores. Based on the comprehensive assessment of a resident, the facility must ensure that– (1) [a] resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and (2) [a] resident having pressure sores receives necessary

of care for urinary tract infections ("UTIs").[33]   During the December survey, Plott violated the standard of care for UTIs for another patient.

During informal dispute resolution prior to the ALJ hearing, CMS deleted the deficiency alleging that residents have access to the outdoor garbage containers.  CMS failed to make a prima facie case on five other deficiencies,[34] such as a staff member storing a lunchbox in a resident's room, slow response to call lights, and foods served at the wrong temperature, when CMS presented no evidence to support these deficiencies at the hearing.  The ALJ did not review the 25 remaining deficiencies from the September survey, even though CMS initially imposed the $500 per day civil money penalty based on all 33 deficiencies.  The ALJ held that it was "not necessary to address all the other alleged deficiencies from the September 2008 survey" because the bedsore and UTI violations "provide a sufficient basis for the enforcement remedies that CMS proposes."

---

treatment and services to promote healing, prevent infection and prevent new sores from developing."

[33]   *Id.* § 483.25(d) "Urinary Incontinence.  Based on the resident's comprehensive assessment, the facility must ensure that– (1) [a] resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary; and (2) [a] resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible."

[34] Deficiency Tags 241, 246, 252, 282 and 364 were not argued in CMS's closing brief.

The Department of Health and Human Services Appeals Board affirmed the $500 per day penalty based on the bedsores and UTI deficiencies from the September survey, but reversed the UTI deficiency and eliminated the $100 per day penalty from the December survey.  The Board found that the $500 per day penalty was reasonable because Plott had a history of noncompliance and was cited for the same two deficiencies in 2005 and 2007.[35]  The Board further held that the ALJ was not required to review the other 25 contested, but unreviewed, deficiencies.

Plott appealed the Board's decision.  We affirm the Secretary's determination that Plott violated the quality of care for bed sores,[36] but reverse the determination for violating the quality of care for urinary tract infections[37] because it is not supported by substantial evidence on the record as a whole.  We also hold that Plott is entitled to administrative review of all deficiencies that CMS cited and remand with directions to review or dismiss the 25 violations that the ALJ and Board did not review.

## III. Standard of Review

"The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."[38]  Substantial

---

[35] *See* 42 C.F.R. § 488.438(f).

[36] *Id.* § 483.25(c).

[37] *Id.* § 483.25(d).

[38] 42 U.S.C. § 1320a-7a(e).

evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[39] An agency's interpretation of its own regulations is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation."[40]

## IV. Analysis

### A.  Bed Sores

Bed sores, also known as pressure sores, pressure ulcers or decubitus ulcers, develop when skin is exposed to prolonged external pressure that restricts blood supply, especially if the skin remains wet on an incontinent patient or is subject to shearing force from being pulled along a bedsheet.  They typically form in areas of the body like the tailbone, where skin is thin, bone is close to the surface, and pressure cannot spread easily.  The reduction in blood flow starves the skin tissue of oxygen and nutrients, causes the skin to thin even more, and tissue to die.  Bed sores ultimately results in open wounds that can require surgery or, if untreated, can cause death.

Bed sores are common in skilled nursing facilities, where many residents are bedridden.  Accordingly, 42 C.F.R. § 483.25(c) requires skilled nursing facilities to

> ensure that – (1) A resident who enters the facility without pressure sores does not

---

[39] *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012).

[40] *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

> develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and (2) A resident having pressure sores receives **necessary** treatment and services to promote healing, prevent infection and prevent new sores from developing.[41]

The Board has interpreted § 483.25(c) to mean that a facility must "go beyond merely what seems reasonable to, instead, always furnish what is *necessary* to prevent new sores, unless clinically unavoidable, and to treat existing ones as needed."[42]

Resident Six, an 81-year-old woman, was admitted to Plott on June 28, 2007. Her diagnoses included dementia, incontinence, hypertension, depression, anemia, recurrent urinary tract infections, and a history of brain cancer. She was entirely dependent on staff, bedridden, and fed through a tube inserted into her stomach. On May 30, 2008, she was hospitalized for a methicillin-resistant staph infection (MRSA) on her scalp over her brain surgery incision. When she was readmitted to Plott on June 5, 2008, her physician prescribed the use of wrist restraints on her bed to keep her from picking at and spreading the infection in her scalp. Thus she was literally bound to her bed, on doctor's orders, because she kept re-injuring her now-diseased scalp.

She first developed bed sores on her tailbone six months after admission in December 2007. One sore formed after her

---

[41] 42 C.F.R. § 483.25(c) (emphasis added).

[42] *See e.g. Koester Pavilion*, DAB No. 1750, at 31, 32 (2000) (emphasis added).

admission, but before she was restrained. The sore continually healed and reopened, six times over the course of nine months.[43]  An additional sore appeared in September 2008 on her left buttock. Substantial evidence on the record as a whole supports the Board's determination that Plott's care of Resident Six violated 42 C.F.R. § 483.25(c).

The Board identified specific treatments that Plott did not provide, such as specialized mattresses that help prevent bed sores.  Pressure relief mattresses use high density foam, air, water, or gel to reduce and redistribute bed sore-causing pressure.  More advanced mattresses reduce the risk of bed sores by alternating pressure between different areas of the body. These mattresses are called low air loss mattresses. They are powered by an air pump that provides sequential inflation and deflation or alternates pressure between the mattress' many air cells.  Despite Resident Six's recurrent bed sores, Plott failed to timely provide two different kinds of mattresses, a pressure relief mattress and a low air loss mattress, even though they were identified by Plott's nurses and physicians as needed interventions.[44]

Plott prepared a long term care plan in June 2007 when Resident Six was first admitted. The plan said that Resident Six would be provided with a pressure relief mattress.  Plott's records show that Resident Six did not receive this mattress

---

[43] It was open from December 26, 2007 to February 29, 2008; March 13 to March 20, 2008; May 23 to May 30, 2008; June 5 to June 18, 2008; June 26 to August 1, 2008; and August 27 to September 22, 2008.

[44] *See Tri-Cnty. Extended Care Ctr.*, D.A.B. 1936, at 16 (2004) (holding that a nursing home violated § 483.25(c), in part, because it failed to provide a pressure relief mattress that had already been identified as needed in the resident's care plan).

until nearly a year later on June 9, 2008.  An October 4, 2008 entry in her care plan says "LE [late entry] for 6/9/08 pressure relief mattress."   Based on this documentation, the Board reasonably determined that the pressure relief mattress was not timely provided.

There is also substantial evidence to support the Board's finding that this resident was later also not given the prescribed low air loss mattress until one and a half months after the prescription.  An outside wound specialist assessed Resident Six's bed sores on August 7 and August 14, 2008.  Both assessments recommended that Plott "continue low air loss mattress."   Plott argues that the specialist's recommendation to "continue use" shows that a low air loss mattress was already in use.   The Board rejected that inference for several reasons.  First, the care plan did not list a low air loss mattress until September 24, 2008.  Second, a state surveyor from the September 2008 inspection testified that Resident Six's mattress was Plott's standard pressure relief mattress and it was "firm to touch."  Third, Plott's nurse testified that Resident Six was using a pressure relief mattress at the time of the survey and that a low air loss mattress was provided "around" September 24, 2008.   The Board reasonably concluded that Plott replaced the pressure relief mattress with the low air loss mattress on September 24, 2008, the last day of the survey.  These reasons together suffice as substantial evidence.

Plott argues that there is no evidence that the bed sores were avoidable or that it failed to successfully treat them. Though Resident Six's bed sores healed and her medical conditions made treatment and avoidance of new sores exceedingly difficult, the regulation requires nursing facilities to "*ensure*" that "pressure sores do[] not *develop*" and that a

"resident having pressure sores *receives necessary treatment* and services to . . . *prevent new sores* from developing."[45] The evidence sufficed under the lenient "substantial evidence" standard, in light of the delay in furnishing the prescribed mattresses, to support the Board's determination.

Likewise, the evidence sufficed for the Board's rejection of Plott's unavoidability defense. "[T]he facility must ensure that [] [a] resident who enters the facility without pressure sores does not develop pressure sores *unless* the individual's clinical condition demonstrates that they were unavoidable."[46] The Board, interprets "unavoidable" as "incapable of prevention *despite* appropriate measures taken in light of the clinical risks."[47] The mattress delays were sufficient evidence for rejection of this defense.[48]

## B.  *Urinary Tract Infections*

Urinary tract infections ("UTIs") are caused by bacteria that enter the urethra and then the bladder.  Because catheter use tends to cause urinary tract infections, regulations require avoidance of catheterization if unnecessary and special care to avoid infections among catheterized residents:

---

[45] 42 C.F.R. § 483.25(c) (emphasis added).

[46] *Id.* § 483.25(c)(1) (emphasis added).

[47] *Harmony Court*, D.A.B. No. 1968, at 11 (2005) (emphasis added).

[48] *Woodland Village Nursing Ctr.*, D.A.B. No. 2172, at 12 (2008); *Golden Living Ctr.*, D.A.B. No. CR2634, at 6 (2012); *Edgemont Healthcare*, DAB No. 2202, at 7 (2008).

Based on the resident's comprehensive assessment, the facility must ensure that–

(1) A resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary; and

(2) A resident who is incontinent of bladder receives **appropriate** treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible.[49]

Resident Five, a 79-year-old woman, was admitted to Plott in 2005. Her diagnoses included diabetes, hypertension, congestive heart failure, Parkinson's Disease, urinary retention and a history of kidney stones. Her susceptibility to urinary tract infections was high for two reasons. First, she had a permanent indwelling catheter. "Urinary tract infection is one of the most common infections occurring in nursing homes and is often related to an indwelling urinary catheter."[50]  The CMS guidance manual for state agency surveyors notes that "by the 30th day of catheterization, bacteriuria is nearly universal" and that individuals with catheters are 40 times more likely to have a urinary tract

---

[49] 42 C.F.R. § 483.25(d) (emphasis added).

[50] *SOM*, *supra* note 8, Appendix PP Guidance to Surveyors for Long Term Care Facilities at Tag F-315.

infection.[51]  She also had a history of "staghorn calculus." Staghorn calculi are branched kidney stones in the urinary tract that increase a patient's risk of developing a urinary tract infection.  Resident Five had two staghorn calculi removed during emergency surgery on January 16, 2007 after she experienced septic shock as a result of a kidney infection.

The surveyors found that Resident Five had four symptomatic urinary tract infections from December 2007 to August 2008.  They cited Plott for not identifying and implementing "new approaches" to prevent the recurrent infections.  The ALJ and Board affirmed this finding.

This finding was not supported by substantial evidence on the record.  There was no evidence that Plott did not provide "appropriate treatment and services" to avoid the infections. Plott prepared a long-term care plan in January 2007 to address the risk.  The plan's treatments included (1) monitoring for signs and symptoms of infection and reporting any noted infections; (2) ensuring daily catheter care and changes as necessary; (3) providing good perineal care; (4) encouraging fluid intake and hydration (urination flushes bacteria); (5) performing laboratory testing as ordered; and (6) administering antibiotics.  When Resident Five experienced urinary tract infections, Plott prepared short-term care plans.  These plans, from January 2007, February 2008, March 2008, June 2008, and August 2008, show that nurses (1) administered antibiotics to treat urinary tract infections as ordered by physicians; (2) encouraged fluid intake; (3) monitored Resident 5 for adverse symptoms; (4) reported symptoms to doctors; (5) and provided good perineal care.  Similarly, the nurses' notes show that they

---

[51] *Id.*

encouraged fluids, kept Resident Five clean and dry, and gave good perineal care.

Two physicians and a nurse testified that the care provided was appropriate. The ALJ asked one physician, Plott's medical director, what "other interventions" he could look for as he reviewed the care plans. He testified that routine interventions include good hygiene, encouraging fluids, not allowing bladder distension, getting residents out of bed to prevent backflow of urine to the kidneys, and preventing other infections. The other physician, a geriatric physician, testified that fluid intake should be maximized. The nurse testified that nurses should provide good perineal care and encourage fluid intake. The CMS guidance manual for state agency surveyors suggests the same treatments for catheterized patients that Plott provided.[52]

We affirmed the Board's determination that Plott violated the bed sore regulation, 42 C.F.R. § 483.25(d), because Plott did not provide special mattresses, even though they were previously identified as required. In contrast, the Secretary has not identified any treatment that Plott should have provided to prevent Resident Five's urinary tract infections. State surveyor nurses suggested silver coated catheters, consultations with specialists in nephrology or urology, and cranberry tablets. But the Secretary does not argue that Plott's failure to provide cranberry tablets or a silver coated catheter violated the regulation. One of the testifying physicians stated that some patients receive cranberry tablets, but the other testified that he did not prescribe cranberry tablets, because "new evidence does not support that as a

---

[52] *SOM*, *supra* note 8, Appendix PP Guidance to Surveyors for Long Term Care Facilities at Tag F-315.

preventive measure." Nobody testified about silver coated catheters or submitted any medical evidence to support their use, and nobody testified that speculative consultations were medically appropriate. There is not substantial evidence on the record as a whole to support the Board's interpretation.

The Secretary argues that, due to Plott's lack of independently considering additional interventions beyond those recommended by her physician, Resident Five experienced recurrent urinary tract infections. But the evidence shows that her catheter and history of staghorn calculus put her at an unavoidably high risk of developing them. The regulation requires Plott to provide "appropriate treatment and services to prevent urinary tract infections,"[53] not to guarantee that they will not occur.

The Board held that Plott's failure to implement new interventions violated the regulation. But, there was no evidence that Plott should have or could have done anything new that would have been "appropriate." Though periodic reviews and revisions of care plans are required, and the surveyor faulted Plott for not revising this resident's care plan to include cranberry tablets etc., no evidence supported her suggested revision or other revisions that might have been "appropriate." The Board did not review her conclusion despite Plott's putting it at issue.

What we are left with, in support of the Board's penalty, is the bed sores determination on one resident, supported by substantial evidence, the urinary tract infections on another, not supported by substantial evidence, and Plott's history, discussed below.

---

[53] 42 C.F.R. § 483.25(d).

## C.  Unreviewed Deficiencies

The agency dismissed one deficiency prior to the ALJ hearing and abandoned another 5 deficiencies from the September survey during the hearing.  Plott appealed the other 28 (27 remaining from September and 1 from December), but the ALJ reviewed only 3 (2 from September and 1 from December), holding that it was "unnecessary" to review the other 25 undismissed and unsettled surveyor's disputed allegations. The ALJ reviewed the $500 per day penalty for September 24 through December 3, 2008 from the September survey and upheld it based on 2 of the 33 deficiencies alleged.  He also upheld the additional $100 per day penalty from December 4 through December 15, 2008 based on one deficiency from the December survey.  The Board only reviewed the three deficiencies that the ALJ upheld, and reversed the December deficiency with the $100 per day penalty.  One reason the ALJ and the Board gave for the superfluity of reviewing the other disputed allegations was that Plott had been cited before for urinary tract infections and bedsores.

The Board's reasoning for not reviewing any other deficiencies is basically that the $500 per day penalty could have been imposed for the remaining two September deficiencies, so the unreviewed surveyor's allegations were "immaterial."  We cannot agree.  Unreviewed allegations of deficiency do indeed affect penalties, as the Board decision demonstrates in this case.  And the Board's position that, so long as the penalty is within the maximum permitted, more deficiencies are immaterial, does not make sense.  Penalties may be higher or lower within an authorized range, depending on the extent of deficiencies.  The Board's position is analogous to claiming that we need not review a criminal

conviction for five bank robberies, if the statutory maximum sentence on one of them exceeded the sentence imposed. Even though the agency might be authorized to impose the same $500 a day penalty regardless of whether there were 33 deficiencies, or 2 or 1, that does not imply that it reasonably would have. Plott makes a constitutional argument we need not reach, because the statute requires that the claimed deficiencies be reviewed or dismissed when they affect penalties imposed.

The right to be heard before the ALJ and the Board arises from the statutory language that "the Secretary shall not make a determination adverse to any person under . . . this section until the person has been given written notice and an opportunity for the determination to be made on the record."[54] Our jurisdiction arises from the provision that "any person adversely affected by a determination of the Secretary under this section may obtain a review of such determination in the United States Court of Appeals."[55] In *Shalala v. Illinois Council on Long Term Care*,[56] the Supreme Court construed this statutory scheme as entitling providers to administrative and judicial review of determinations of penalties, though not, as in that case, of the regulations generally in the absence of any determination or penalty imposed in a particular case. "[T]he relevant determination that entitles a dissatisfied home to review is any determination that a provider has failed to

---

[54] 42 U.S.C. § 1320a-7a(c)(2). The Medicare Act, 42 U.S.C. § 1395i(h)(2)(B)(ii), incorporates and applies the review provisions of the Social Security Act to civil money penalties under section 1320a-7a(a).

[55] *Id.* § 1320a-7a(e).

[56] 529 U.S. 1 (2000).

comply substantially with the statute, agreements or regulations, whether termination or *some other remedy* is imposed."[57]

The Board decision says that "noncompliance findings that are not material to the outcome of the appeal," need not be addressed by the ALJ. The Board's theory appears to be that since the ALJ had statutory authority to impose a $500 a day penalty for one, two, three, or 33 deficiencies, $500 would be within the reasonable range regardless, so the unreviewed deficiencies were immaterial to the result. Plott argues, not that immaterial determinations must nevertheless be reviewed, but rather that the unreviewed determinations were, in fact, material.

Plott and their amicus, California Association of Health Facilities, have two materiality arguments: (1) that the agency posts the unreviewed deficiencies on a public website, and (2) that the unreviewed deficiencies are used to enhance penalties in future proceedings. We reject the first argument, but are persuaded by the second.

The website argument cannot be correct, because the statute requires posting of surveyors' deficiency allegations before they could possibly be reviewed.[58] The statute requires the Secretary to establish a website linking to state surveys such as the one done in this case.[59] The website must post staffing data, links to state inspection reports, responses

---

[57] *Id.* at 21 (internal quotation marks omitted).

[58] 42 U.S.C. § 1395-3(b)(5)(E).

[59] *Id.* § 1395i-3(i)(1)(A)(ii).

to the reports, complaints, penalties, and other information to assist consumers.[60]  The website gives nursing homes stars, like hotels on a travel site, from one star to five stars, based partly on unreviewed deficiencies in survey reports.  The inspection score is calculated, in part, by using points assigned to deficiencies.[61]

Review is allowed, but it comes later.  The statute requires the Secretary to provide a review process for accuracy, clarity, timeliness, and comprehensiveness of the website's content.[62]  If a nursing home disagrees with a rating that it receives, it can contact the "Five-Star hotline."[63]  However, this review process only applies to the data provided by the nursing homes themselves such as self-reported quality and staffing data.  The only way to dispute survey data is to appeal through the administrative process.[64]  Plott argues that it is entitled to review of all deficiencies not dismissed, and the Secretary argues that the posting, unlike a

---

[60] *Id.* § 1395i-3(i)(1)(A)(ii).

[61] Centers for Medicare and Medicaid Services, *Design for Nursing Home Compare Five-Star Quality Rating System: Technical Users' Guide* (July 2012) at 4, *available at* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/downloads/usersguide.pdf.

[62]  42 U.S.C. § 1395i-3(i)(2)(A).

[63] Centers for Medicare and Medicaid Services, *Questions and Answers, Improving the* Nursing Home Compare *Web site: The Five-Star Nursing Home Quality Rating System* (December 18, 2008) at 13, *available at* http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/downloads/QsandAsFinal.pdf.

[64] *Id.*

monetary penalty, is not a "remedy," so it is not subject to
review.

Though the matter is not entirely without doubt, we
conclude that the Secretary has the better of this argument.
The Court in *Illinois Council* held that though unreviewed
deficiencies are posted on the website,[65] that nursing homes
cannot challenge agency action until "termination or some
other remedy is imposed."[66] Readers of the website deciding
not to put their relatives in low-rated nursing homes is a not
a "remedy" under the statute.[67] The penalty is imposed, at
least directly, by consumers, not the agency. The statute
requires the Secretary to post survey information and
statements of deficiencies "within 14 calendar days" of when
the information is made available to the nursing homes.[68]
Congress cannot have contemplated an appellate process that
could be concluded within 14 calendar days, so it must have
determined that timeliness of website postings outweighed
the importance of review prior to posting. That interpretation
is consistent with the statutory command that the Secretary
use survey information provided by the states to update the

---

[65] *Illinois Council*, 529 U.S. at 22.

[66] *Id.* at 21 (internal quotation marks omitted).

[67] *See e.g.*, 42 U.S.C. § 1395cc(h) (termination of participation
agreements); 42 U.S.C. § 1395i-3(b)(3)(B)(ii) (civil money penalties for
false statements in resident assessments); 42 U.S.C. § 1395cc(h)(C)(i)(II)
(denial of payment and appointment of temporary management);
42 U.S.C. § 1395cc(h)(C)(i)(III) (loss of approval of skilled nursing
facility's nurse aide training program).

[68] 42 U.S.C. § 1395i-3(b)(5)(A).

website "as expeditiously as practicable."[69]  This statutory language compels the reading that Plott was not entitled to review of the deficiencies alleged in the survey prior to posting on the website.

We agree with Plott's other argument, that the unreviewed deficiency allegations do affect the penalty.  In *Illinois Council*, the Secretary assured the Court that the agency did not increase sanctions in later cases on account of unreviewed deficiency findings in earlier instances:

> And, the Council's amici assert, compliance actually harms the home by subjecting it to increased sanctions later on by virtue of the unreviewed deficiency findings, and because the agency makes deficiency findings public on the Internet, §488.325.  The short conclusive answer to these contentions is that the Secretary denies any such practice.[70]

The assurance that the Secretary gave the Supreme Court, is not the Secretary's practice now.

The Board's 2011 decision in this case held that deficiencies in 2005 and 2007 surveys not only may, but must, increase the penalty imposed in a later survey.  The Board held that it was "prejudicial error" for the ALJ *not* to give weight to evidence of this history "merely because the earlier deficiencies were apparently quickly corrected, and required no enforcement penalties."  The Board holds that

---

[69] *Id.* § 1395i-3(b)(5)(E).

[70] *Illinois Council*, 529 U.S. at 21–22.

weight must be given to prior noncompliance even if "no remedy was imposed at the time."[71]   The Board cites the statutory language requiring "incrementally more severe fines for repeated . . . deficiencies."[72]

That is correct as far as it goes.  The implication, though, vitiates the soundness of the Board's position that unpenalized deficiencies are unreviewable.  The Board's argument that the 25 unreviewed deficiency allegations are immaterial to the penalty cannot be reconciled with the Board's argument that the penalties have to be increased if there is a history of prior deficiencies, even if they were not subject to review.  A fair reading of the statute requires review of alleged deficiencies because they may affect future penalties.

The Board addresses this with a footnote suggesting that earlier unreviewed deficiencies may be contested when they are used to determine the reasonableness of a penalty in a later proceeding.  We cannot see why Congress would have meant that a deficiency unreviewable in 2005, because no penalty was imposed then, would become reviewable in 2011 because it established a prior history.   Long delayed proceedings are generally disfavored because they are less reliable on account of the difficulties of obtaining evidence.  In the nursing home context, the argument that a 2005 deficiency allegation is not reviewable in 2005, but is in a proceeding six years later, verges on the ridiculous.  Residents of nursing homes, often the most important witnesses, tend to be old and sick.  By the time review is

---

[71] *Id.*

[72] 42 U.S.C. § 1395i-3(h)(2)(B).

allowed under the Board's interpretation, many will be dead. And many of the staff are likely to have moved on to other jobs and be difficult or impossible to locate.

We are compelled, by the Board's use of unreviewed deficiencies to increase current penalties, to conclude that survey allegations of deficiencies must be reviewed or dismissed. Of course a nursing home could waive review, but it did not waive review here. If it does not, the nursing home is entitled to review in the proceeding stemming from them, and need not await a subsequent proceeding when they are used to enhance penalties.

Our sister circuits, to they extent they have spoken on this question, are split. The Eighth Circuit addressed the reviewability issue in *Grace Healthcare v. United States Department of Health and Human Services*.[73] In that case, as in this one, the ALJ did not address most of the deficiencies alleged by the surveyor on the ground that the one reviewed "is, in and of itself, sufficient" to justify the penalty imposed.[74]   *Grace Healthcare* holds that all the adverse findings appealed should be either upheld or reversed[75] because, the nursing home had argued and the government did not dispute that, the unreviewed findings "remain accessible to the public and can be used to support damage claims against the provider in private litigation."[76]

---

[73] 603 F.3d 412 (8th Cir. 2010).

[74] *Id.* at 417.

[75] *Id.*

[76] *Id.* at 423.

The Sixth Circuit, in *Claiborne-Hughes Health Center v. Sebelius*,[77] upheld a Board determination where only one of seven alleged deficiencies was reviewed. In *Claiborne*, unlike this case, the minimum statutory penalty was imposed, so it could not have been reduced even if all six unreviewed deficiency allegations had been overturned.[78] The court held that in the interest of judicial economy, the agency could "choose to address only those deficiencies that have a material impact on the outcome of the dispute."[79]

*Claiborne* is distinguishable because the penalty in our case could have been lower than it was, but we would disagree with it regardless. The Board holds that "repeated deficiencies" must necessarily be given weight and result in more severe fines, and reversed the ALJ in this case for not giving weight to prior unreviewed deficiencies. That means that unreviewed deficiencies do, in fact, have a material impact. One might argue that their impact is only on a future dispute, not the present one, but that implies the impractical result that review may take place only later, when it is less reliable, not earlier, when it can be more reliable. Also, since surveys are mandatory at least every fifteen months,[80] the agency's supervisory relationship with the nursing home is one continuing relationship, not an occasional discrete case. For materiality purposes, the history of prior deficiencies is always part of that nursing home's continuing case, under the

---

[77] 609 F.3d 839 (6th Cir. 2010).

[78] *Id.* at 842.

[79] *Id.* at 847.

[80] 42 U.S.C. § 1395i-3(g)(2)(A)(iii).

statutory requirement for incrementally more severe penalties as interpreted by the agency.

### V. Conclusion

We hold that substantial evidence on the record as a whole sufficed to support the bed sore deficiency in regard to Resident 6, but there was not substantial evidence on the record taken as a whole to support the UTI deficiency in regards to Resident 5.  We further hold that if a provider appeals a deficiency claimed in a survey, the deficiency must either be dismissed or reviewed.  Regarding the public website, we hold that the agency need not afford review before survey results are posted, but must allow review and correction as required by the statute.[81]

We remand to the Board to (1) review or dismiss the unreviewed and appealed deficiencies alleged, and (2) reconsider the penalty in light of our reversal of the Resident 5 determination.

**REVERSED in part and REMANDED.**

CHRISTEN, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's holding with respect to the two deficiencies that formed the basis of the $500 per day penalty sustained by the Department of Health and Human Services

---

[81] 42 U.S.C. § 1395i-3(i)(B)(2).

Appeals Board.  But because the court's holding as to the unreviewed deficiencies accords with neither our statutory jurisdiction nor with well-established principles of judicial review, I respectfully dissent from Part C of the court's analysis.

The skilled nursing facility provisions of the Medicare Act provide: "[T]he Secretary may impose a civil money penalty in an amount not to exceed $10,000 for each day of noncompliance.  The provisions of section 1320a-7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty . . . ."  42 U.S.C. § 1395i-3(h)(2)(B)(ii)(I).  Section 1320a-7a(e) gives this court original jurisdiction over appeals from the Secretary's decision to impose a civil money penalty.[1]

In its decision in this case, the Board concluded, consistent with its prior decisions, that neither it nor the ALJ was required to address noncompliance findings not material to the penalty imposed.  The court concludes that unreviewed deficiencies were in fact material to the Board's decision to uphold the $500 per day penalty.  In reaching this conclusion,

---

[1] The Medicare Act gives federal district courts original jurisdiction over appeals from most determinations by the Secretary of Health and Human Services.  *See* 42 U.S.C. § 1395cc(h)(1)(A) (referencing 42 U.S.C. § 405(g)).  Only civil money penalty assessments are directly appealable to a circuit court.  *See* 42 U.S.C. § 1395i-3(h)(2)(B)(ii)(I) (referencing 42 U.S.C. § 1320a-7a); *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 8 (2000); *Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs.*, 742 F.3d 1239, 1249 (10th Cir. 2014) ("[O]ut of all the remedies the Secretary may impose, Congress has specified that challenges to [civil money penalties], not challenges to other noncompliance remedies, may go directly to a circuit court under 42 U.S.C. § 1320a-7a(e).").

the court relies on the fact that the Board used unreviewed deficiencies from 2005 and 2007 surveys to support the penalty imposed.[2]  But Plott does not contest the Board's reliance on the 2005 or 2007 deficiencies.  Instead, Plott challenges the agency's refusal to review or dismiss all of the deficiencies identified in the September 2008 survey.  The Board clearly did not rely on the 2008 unreviewed deficiencies in upholding the $500 per day penalty, and our jurisdiction is limited to reviewing the Board's decision with respect to that penalty.

The court overlooks our lack of jurisdiction and directs the agency to review or dismiss all of the 2008 unreviewed deficiencies.  The court points out that the agency *might* use these deficiencies to determine the reasonableness of a penalty in a later proceeding.  I agree that the agency's practice of using unreviewed deficiencies from prior surveys to support a later penalty is troubling.  If Plott had asked our panel to review this practice by contesting the Board's reliance on the unreviewed deficiencies from 2005 and 2007, I might have concluded that the agency's practice is impermissible.  But Plott waived this challenge by failing to raise it in its briefing.  *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

---

[2] The Medicare Act and applicable regulations require the Secretary to impose more severe fines for repeated deficiencies.  *See* 42 U.S.C. § 1395i-3(h)(2)(B)(iii) ("The Secretary shall specify criteria, as to . . . the amounts of any fines . . . .  Such criteria . . . shall provide for the imposition of incrementally more severe fines for repeated or uncorrected deficiencies."); 42 C.F.R. § 488.438(f) ("In determining the amount of penalty, CMS does or the State must take into account the following factors: (1) The facility's history of noncompliance, including repeated deficiencies. . . .").

The court argues it is preferable to force the agency to review all of the 2008 deficiencies now, in case they are used to support a penalty later, because review will be easier and more reliable now.    But this court's subject matter jurisdiction is defined by Congress, and here, Congress has specified that we may directly review only the Board's penalty determination.  *See* 42 U.S.C. § 1320a-7a(e).  This court is not at liberty to expand its jurisdiction so that we may effect what, in our view, is sound policy.  *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) ("Congress has the constitutional authority to define the jurisdiction of the lower federal courts, and, once the lines are drawn, limits upon federal jurisdiction . . . must be neither disregarded nor evaded." (citation and internal quotation marks omitted)).

The court raises the spectre that, absent its holding, the *only* means Plott would have to challenge the unreviewed 2008 deficiencies would be to wait until they are used to support a penalty.  But at oral argument, counsel for the agency suggested that if Plott has a due process claim stemming from the unreviewed deficiencies, Plott could bring an action in district court.  *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19–20 (2000); *see also* 5 U.S.C. § 704.  I do not opine on whether such a challenge would be successful, but the parties do not dispute that Plott has a forum, and if Plott disagreed with the district court's decision, it could then properly appeal to our court.

The wisdom of jurisdictional and waiver rules is that they prevent courts from overreaching.  Because: (1) Plott did not raise the issue of the Board's reliance on the 2005 and 2007 unreviewed deficiencies; (2) the issue of whether the agency might rely on the unreviewed 2008 deficiencies to support a future penalty is not ripe; and (3) our jurisdiction under

42 U.S.C. § 1320a-7a(e) is limited to reviewing the $500 per day penalty assessment, I would leave the question of the propriety of the agency's use of unreviewed deficiencies for another day.  The court instead requires that the agency change its procedures wholesale.  As a result, it may become more difficult for the agency to ensure the safety of our nation's many skilled nursing facilities.  Either the agency will have to devote much more time and energy to adjudicating deficiencies on which no penalty is based, or the agency will have to dismiss all such deficiencies.  This result may be a good thing in the long run, or it may be a bad thing—it is hard to tell because the agency has not had an adequate opportunity to defend its procedures in this appeal.

I respectfully dissent from Part C of the court's analysis.